## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| Curtis Harris, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>My Credit Guy, L.L.C.,<br><br>Defendant. | **Civil File No. _____**<br><br>**CLASS ACTION COMPLAINT**<br><br>**WITH JURY TRIAL DEMANDED** |

COMES NOW Curtis Harris on behalf of himself and all others similarly situated, and for Plaintiff's Class Action Complaint against Defendant My Credit Guy, L.L.C., states and alleges as follows:

### INTRODUCTION

1. The United States Congress has found abundant evidence that the "advertising and business practices of some companies engaged in the business of credit repair services have worked a financial hardship upon consumers, particularly those of limited economic means and who are inexperienced in credit matters." 15 U.S.C. § 1679(a)(1).

2. As such, the United States Congress and the Minnesota legislature both enacted similar laws "(1) to ensure that prospective buyers of the services of credit repair organizations are provided with the information necessary to make an informed decision regarding the purchase of such services; and (2) to protect

the public from unfair or deceptive advertising and business practices by credit repair organizations." 15 U.S.C. § 1679(b); *see also* Minn. Stat. § 332.52, *et. seq.*

3.      In this case, Defendant My Credit Guy, L.L.C. ("My Credit Guy") advertised and promised Plaintiff Curtis Harris ("Harris") credit repair services at a fixed price.

4.      However, My Credit Guy violated Minnesota and federal law by failing to include required information in its contract, charging Harris before it fully performed the services, and by attempting to make further unauthorized charges to Harris' bank account.

5.      My Credit Guy has been committing these same violations against consumers in Minnesota and across the country.

6.      Harris brings this class action for injunctive relief, declaratory relief, and damages based on My Credit Guy's false statements, unlawful contracts, fraud and deception, breach of contract, and other illegal credit repair actions and omissions.

## JURISDICTION

7.      Because this case arises under the Credit Repair Organizations Act ("CROA"), 15 U.S.C. §§ 1679-1679j, jurisdiction of this Court arises under 28 U.S.C. § 1331, and supplemental jurisdiction for state law claims arises under 28 U.S.C. § 1367.

8.      Venue is proper in this Court under 28 U.S.C. § 1391 because a substantial part of the claim arose in Minnesota, Plaintiff lives in the District, and the Defendant conducts business here.

## PARTIES

9.     Plaintiff Curtis Harris ("Harris") is a natural person who resides in the city of Waterville, County of Le Sueur, State of Minnesota, is a "consumer" as that term is defined by 15 U.S.C. § 1679a(1), and is a "buyer" as that term is defined by Minn. Stat. § 332.52, Subd. 2.

10.    Defendant My Credit Guy, L.L.C. ("My Credit Guy") is an Arizona limited liability company that does business in Minnesota, with a principal executive office address located at 4365 E. Pecos Road, Suite 139, Gilbert, AZ 85295, and a Minnesota registered address of: Registered Agents Inc., 202 N Cedar Ave, Suite #1, Owatonna, MN 55060–2306.

11.    My Credit Guy is a "person" as that term is used in 15 U.S.C. §§ 1679b-1679g, is a "credit repair organization" as that term is defined by 15 U.S.C. § 1679a(3), and is a "credit services organization" as that term is defined by Minn. Stat. § 332.52, subd. 3.

## FACTUAL ALLEGATIONS

12.    In the summer of 2023, Harris was in the process of purchasing and moving his family to a new home.

13.    By August 2023, Harris had nearly concluded the financing process, signed a purchase agreement to buy a new home, paid the earnest money, had an inspection conducted, and took several steps toward moving his family to the new home including renting a moving truck and enrolling his kids in a new school.

14.     However, two days before the scheduled closing date, the lender contacted Harris to inform him that his loan was on hold, and the next day—one day before the closing—the lender informed Harris he did not qualify for the loan, despite previously indicating he was pre-qualified.

15.     Harris lost the home he had contracted to buy which caused substantial disruptions to his family's lives.

16.     Harris then sought financing to try to purchase a different home, but he was having difficulties getting approved by lenders because his credit score had been lowered.

17.     As such, Harris sought help to repair his credit report to correct any errors and to prevent these types of disruptions from happening again.

18.     My Credit Guy promised Harris just this kind of credit services to repair his credit at a fixed price.

19.     On August 31, 2023, Harris signed an Initial Services Agreement (the "Contract") for credit services with My Credit Guy. (**Exhibit A**.)

20.     Also on August 31, 2023, Harris signed a Payment Authorization form with My Credit Guy, which stated, "Please provide a payment source for our program fees. Our fees will not be billed to this account until after full completion of the services in section III of the contract." (**Exhibit B**.)

21.     Also on August 31, 2023, Harris signed a Credit Monitoring Agreement with My Credit Guy. (**Exhibit C**.)

22.     The Contract stated that My Credit Guy would perform the credit services for a one-time fixed price.

23.     The Contract also stated, "[t]he Company shall not charge the Customer or receive payment before the completion of the Initial Services and payment by the Customer is due on the 30th day after the Company's completion of the Initial Services."

24.     However, My Credit Guy immediately proceeded to violate that clause by charging Harris $19.99 to obtain his credit report and then charging him $325.00 on October 2, 2023, for the credit services, before My Credit Guy had performed the services under the Contract.

25.     The Contract did not require payment or authorize any further charges for the Contract services, other than the one-time fixed price.

26.     However, after charging Harris the one-time fixed price of $325.00, My Credit Guy then attempted to charge Harris a recurring $100-per-month fee in order to continue its services for him.

27.     My Credit guy attempted these additional charges to Harris' debit card connected to his checking account on or about October 31 and November 1, 2023. These amounts and charges were not agreed to in the Contract.

28.     While the Payment Authorization form provided My Credit Guy with Harris' debit card information, it did not authorize any further or recurring payments. (*See* **Exhibit B**.)

29.     On October 30, 2023, Harris asked My Credit Guy for copies of the credit dispute letters that it allegedly sent on Harris' behalf, but My Credit Guy refused to provide these letters to Harris, alleging that the letters are proprietary.

30.     On November 1, 2023, Harris asked My Credit Guy for a copy of any contract that purportedly authorized the $100 recurring monthly payment.

31.     On November 2, 2023, My Credit Guy emailed Harris stating, "Regarding the monthly invoices, per Minnesota law we do have to send a contract for you to sign before each monthly invoice. I apologize, due to lack of communication on our part it looks like we didn't get that sent. . . . We will still need to get the contract signed in order to continue services moving forward."

32.     On November 3, 2023, Harris emailed My Credit Guy that he no longer needed its services.

33.     However, also on November 3, 2023, My Credit Guy again attempted to charge $100 to Harris' debit card even though he still had not signed any agreement authorizing such a charge and told My Credit Guy that he no longer wanted its services.

34.     My Credit Guy then continued attempting to charge the $100 fee to Harris' debit card account on November 7, 10, 14, 17, and 21, 2023.

35.     As such, My Credit Guy attempted to make unauthorized charges to Harris' debit card connected to his checking account on October 31, and November 1, 3, 7, 10, 14, 17, and 21, 2023.

36.     My Credit Guy knew these charges were unlawful under Minnesota law.

37.     The Contract did not include the total amount of all payments to be made by Harris in order to receive My Credit Guy's services.

38.     My Credit Guy's failure to include the $100 recurring payments required for its services in the Contract was an untrue or misleading representation in the offer or sale of its credit services, and it operated as fraud or deception upon Harris in connection with the offer and sale of such services.

39.     My Credit Guy's repeated attempts to charge Harris' debit card $100—even after Harris told My Credit Guy the charge was not authorized and he no longer wanted its services—made Harris so concerned that he moved the money out of the checking account, which was connected with his debit card, and into another account so that My Credit Guy could not take more of his money.

40.     Harris was afraid to put money into his own checking account because My Credit Guy continued to make unauthorized charges to that account.

41.     In addition to these unauthorized charges, My Credit Guy's Contract also did not conform to the requirements of the law, including the Minnesota Credit Services Organization Act ("MN CSOA") and the federal Credit Repair Organizations Act "CROA").

42.     The Contract did not include the percentage of My Credit Guy's customers for whom My Credit Guy has fully and completely performed the services that it also agreed to perform for Harris, as required by MN CSOA.

43.     My Credit Guy's contract is facially violative of CROA and MN CSOA, as purporting to only provide "initial services," and not fully performed services as required by CROA and MN CSOA.

44.     The Contract did include an attempt by My Credit Guy to have Harris waive certain rights he has under MN CSOA and CROA, including, but not limited to, his rights to assert certain legal claims and seek certain types and amounts of damages under Minnesota and federal law, and to bring claims in Minnesota courts.

45.     The Contract provided that "Customer hereby agrees that, to the fullest extent permitted by law, Company's total liability to Customer for any and all injuries, claims, losses, expenses, or damages whatsoever arising out of or in any way related to this Agreement from any cause or causes of action . . . shall not exceed the amounts paid by the Customer to the Company."

46.     The Contract provided that "TO THE FULLEST EXTENT PERMITTED BY LAW, IN NO EVENT WILL COMPANY BE LIABLE TO CUSTOMER, OR TO ANY THIRD PARTY, FOR ANY INDIRECT, CONSEQUENTIAL, INCIDENTAL, SPECIAL, PUNITIVE OR EXEMPLARY DAMAGES OF ANY NATURE."

47.     The Contract also purported to have Harris waive all rights he has under the MN CSOA by stating that the "[a]ll matters relating to this Agreement, and any dispute or claim arising therefrom or related thereto . . . shall be governed by and construed in accordance with the internal laws of the State of Arizona without giving effect to any choice or conflict of law provision or rule."

48.    The Contract also provided that "[t]he Parties hereby irrevocably and unconditionally agree that any action, suit or proceeding, at law or equity, arising out of or relating to this Agreement shall only be brought in any federal court of the District of Arizona or any state court located in Maricopa County, State of Arizona, and . . . hereby irrevocably and unconditionally waives (by way of motion, as a defense or otherwise) any and all jurisdictional, venue and convenience objections or defenses that the Party may have."

49.    The Contract also provided that "[i]n the event that any action, suit, or other legal or dispute resolution proceeding is instituted or commenced by either Party hereto against the other Party arising out of or related to this Agreement, the prevailing Party shall not be entitled to recover its reasonable attorneys' fees and costs from the non-prevailing Party."

50.    My Credit Guy has violated Minnesota and federal law by failing to include required information in its contract, charging Harris before My Credit Guy fully performed the services, and by attempting to make further unauthorized charges to Harris' debit card account.

51.    My Credit Guy took advantage of Harris while he was most vulnerable trying to recover from the disruptions to his life, and as a result of My Credit Guy's actions and omissions, Harris and other class members suffered actual damages, including without limitation out-of-pocket expenses, informational injury, and emotional distress.

52.     Specifically, Harris was injured by having to pay $19.99 to obtain his credit report and pay My Credit Guy $325.00 before My Credit Guy would perform the services and before those amounts were due under the Contract and under the law. Other class members made similar payments. The prepayment of these out-of-pocket expenses constitute a concrete injury in fact because Harris and other class members lost the time value of their money. Harris and other class members were deprived of the use of those funds, so the funds were no longer available for his own use to pay his creditors to improve their credit report, or for his general living expenses.

53.     Harris and other class members were also injured because My Credit Guy did not fully perform the services for which Harris and other class members paid My Credit Guy.

54.     Harris and other class members were also injured because they did not receive the benefits of the provisions of CROA and MN CSOA that My Credit Guy violated.

55.     Moreover, My Credit Guys' repeated attempts to make unauthorized charges to Harris' debit card and checking account caused him significant inconvenience, emotional distress, including stress, worry, and anxiety.

56.     Harris was so concerned that he moved his money out of the checking account so My Credit Guy could not access it.

57.     Likewise, Harris was afraid to put money into his own checking account because My Credit Guy continued making unauthorized charges to his account.

58.     My Credit Guys' failure to provide complete and accurate information in its contracts and disclosures, including but not limited to providing a false disclosure of the total amount owed under the Contract, also caused Harris and other class members informational injuries, because they would have chosen other courses of action and spent their money in other ways if full and accurate information was provided to them.

59.     The injuries that Harris and other class members suffered are analogous to the common law doctrine of unjust enrichment—i.e., Harris paid My Credit Guy for services for which Harris did not receive a benefit, but My Credit Guy was enriched.

60.     The injuries that Harris and other class members suffered are also analogous to the common law doctrine of invasion of privacy.

61.     Congress has determined that credit reporting is private personal identity information.

62.     My Credit Guy accessed, obtained, and examined Harris' private information without sufficient legal basis.

63.     In addition, My Credit Guy, purporting to be Harris' agent, allegedly made communications to others regarding Harris' private information, but My Credit Guy has refused to disclose those communications to Harris.

64.     My Credit Guy has been committing these same violations against thousands of consumers across the country, and dozens if not hundreds of consumers in Minnesota.

65.     My Credit Guy's illegal conduct directed to the public at large is ongoing.

66.     At all times pertinent hereto, My Credit Guy acted by and through its agents, servants, or employees who were acting within the course and scope of their agency or employment, and under the direct supervision and control of My Credit Guy.

## CLASS ALLEGATIONS

67.     Plaintiff brings this action individually and as a class action pursuant to Rules 23(a) and 23(b) of the Federal Rules of Civil Procedure, on behalf of the following Classes:

    a.    State Law Classes:

    All consumers in the State of Minnesota who:

      i.   have been charged fees by My Credit Guy for credit services before My Credit Guy performed such services in violation of MN CSOA;

     ii.   have been charged fees by My Credit Guy for credit services when such fees were not authorized by contract or law in violation of MN CSOA;

   iii.   have entered into contracts with My Credit Guy that did not include the total amount of all payments to be made by the consumer in violation of MN CSOA;

   iv.   have entered into contracts with My Credit Guy but did not receive all of the services promised in the contracts after the consumers paid the one-time fixed price in violation of MN CSOA;

     v.  have entered into contracts with My Credit Guy that did not include the percentage of My Credit Guy's customers for whom the My Credit Guy has fully and completely performed the services that My Credit Guy agreed to perform for the consumer in violation of MN CSOA; and

    vi.  Who My Credit Guy attempted to have waive certain rights under MN CSOA.

b.    **Federal Law Classes:**

All consumers inside and outside the state of Minnesota who:

     i.  have been charged fees by My Credit Guy for credit services before My Credit Guy performed such services in violation of CROA;

    ii.  have been charged fees by My Credit Guy for credit services when such fees were not authorized by contract or law in violation of CROA;

   iii.  have entered into contracts with My Credit Guy that did not include the total amount of all payments to be made by the consumer in violation of CROA;

    iv.  have entered into contracts with My Credit Guy but did not receive all of the services promised in the contracts after the consumers paid the one-time fixed price in violation of CROA; and

v.  who My Credit Guy attempted to have waive certain rights

under CROA.

68.   The individuals in the putative sub-classes defined above are so numerous that joinder of all members is impracticable.

69.   There are questions of law and fact common to the putative class members that predominate over any questions solely affecting individual members, including, but not limited to:

a.   Whether My Credit Guy violated CROA and MN CSOA by charging fees for credit services before My Credit Guy performed such services;

b.   Whether My Credit Guy violated CROA and MN CSOA by charging fees for credit services when such fees were not authorized by contract or law;

c.   Whether My Credit Guy violated CROA and MN CSOA by entering into contracts with My Credit Guy that did not include the total amount of all payments to be made by the consumer;

d.   Whether My Credit Guy violated MN CSOA by entering into contracts that did not include the percentage of My Credit Guy's customers for whom the My Credit Guy has fully and completely performed the services that My Credit Guy agreed to perform for the consumer; and

e.     Whether My Credit Guy violated CROA and MN CSOA by attempting

to have consumers waive certain rights under those laws; and

f.     The proper measure of damages for class members.

70.     Plaintiff's claims are typical of those of the putative classes. Like it did to

Plaintiff, My Credit Guy made the same unauthorized charges and failed to include

required disclosures in its contracts with all Class members.

71.     All of the described conduct affecting Plaintiff would affect every other Class

member in the same manner.

72.     Given Plaintiff's losses, Plaintiff has the incentive and is committed to the

prosecution of this action.

73.     Plaintiff will fairly and adequately protect the interests of the putative classes

and has retained as counsel a law firm that numerous courts have found sufficiently

experienced in class actions to be appointed as class counsel.

74.     There are no known conflicts between Plaintiff and the classes he seeks to

represent.

75.     Class certification is appropriate under Fed. R. Civ. P. 23(b)(3) because

questions of law and fact common to the Classes predominate over any questions

affecting only individual members of the Classes, and because a class action is

superior to other available methods for the fair and efficient adjudication of this

controversy.

76.     My Credit Guy's conduct as described in this Complaint stems from common

practices. Class members do not have an interest in pursuing separate individual

actions against My Credit Guy, as the amount of each Class member's individual claims is relatively small compared to the expense and burden of individual prosecution.

77.     Class certification is also appropriate under Fed. R. Civ. P. 23(b)(3) because the prosecution of separate actions by individual members of the class would involve duplicative litigation that might result in inconsistent or varying adjudications, which would establish incompatible standards of conduct for My Credit Guy and would be a waste of limited judicial resources.

78.     Class certification is also appropriate under Fed. R. Civ. P. 23(b)(3) because My Credit Guy has acted on grounds generally applicable to the classes, thus making injunctive relief and corresponding declaratory relief appropriate with respect to the classes as a whole.

79.     Moreover, management of this action as a class action will not present any likely difficulties. In the interests of justice and judicial efficiency, it would be desirable to concentrate the litigation of all Class members' claims in a single forum.

80.     The identities of the Class members may be obtained using My Credit Guy's records.

**TRIAL BY JURY**

81.     Harris is entitled to and hereby requests a trial by jury.

**CAUSES OF ACTION**

**COUNT I**
**CREDIT REPAIR ORGANIZATIONS ACT**
**15 U.S.C. § 1679, *et. seq*.**

82.    Harris incorporates by reference all preceding paragraphs as though fully stated herein.

83.    Defendant My Credit Guy's foregoing actions and omissions violated numerous and multiple provisions of CROA, including without limitation 15 U.S.C. §§ 1679b, 1679d, 1679f, and 1697g.

84.    Specifically, My Credit Guy charged Harris and other class members money for credit services before such services were performed in violation of 15 U.S.C. § 1679b(b).

85.    Indeed, My Credit Guy's contract is facially violative of CROA, as purporting to only provide "initial services," and not fully performed services as required by CROA.

86.    My Credit Guy also made unauthorized charges to Harris and other class members' bank accounts, even after Harris notified My Credit Guy that he never authorized these charges, in violation of 15 U.S.C. § 1679b(b).

87.    My Credit Guy's Contracts with Harris and other class members did not include the total amount of all payments to be made in violation of 15 U.S.C. § 1679d(b)(1).

88.    My Credit Guy's failure to notify Harris and other class members in the Contract of the total price required for its services and its attempt to make

unauthorize charges to Harris and other class members' bank accounts were untrue or misleading representations and constituted the commission of fraud and deception upon Harris and other class members in connection with the offer or sale of the services of the credit repair organization in violation of 15 U.S.C. § 1679b(a)(3)–(4).

89.    My Credit Guy attempted to have Harris and other class members waive certain rights under CROA including, but not limited to, rights to assert certain legal claims and seek certain types and amounts of damages under CROA in violation of 15 U.S.C. §§ 1679f(a)–(b), 1679g.

90.    As a result of My Credit Guy's violations of §§ 1679b, 1679d, 1679f, and 1697g, Harris and other class members have suffered actual damages, including without limitation out-of-pocket expenses, informational injury, and emotional distress.

91.    Specifically, Harris was injured by having to pay $19.99 to obtain his credit report and pay My Credit Guy $325.00 before My Credit Guy would perform the services and before those amounts were due under the Contract and under the law. Other class members made similar payments.

92.    The prepayment of these out-of-pocket expenses damaged Harris and other class members because they lost the time value of their money—they were deprived of the use of those funds, so the funds were no longer available for their own use to pay their creditors to improve their credit report, or for their general living expenses.

93.     One reason 15 U.S.C. § 1679b(b) prohibits credit repair organizations from charging for credit services before such services are performed is to ensure that consumers can still pay their creditors while the services are being performed.

94.     Harris and other class members were also injured because My Credit Guy did not fully perform the services for which Harris and other class members paid My Credit Guy.

95.     Harris and other class members were also injured because they did not receive the benefits of the provisions of CROA that My Credit Guy violated.

96.     Moreover, My Credit Guys' repeated attempts to make unauthorized charges to Harris' debit card and checking account caused him emotional distress, including stress, worry, and anxiety. Harris was so concerned that he moved his money out of the checking account so My Credit Guy could not access it. Likewise, Harris was afraid to put money into his own checking account because My Credit Guy continued making unauthorized charges to his account.

97.     My Credit Guy's failure to provide complete and accurate information in its contracts and disclosures also caused Harris and other class members informational injuries, because they would have chosen other courses of action and spent their money in other ways if full and accurate information was provided to them.

98.     Harris and other class members are therefore entitled to recover actual damages pursuant to 15 U.S.C. § 1679g.

99.    My Credit Guy's noncompliance was frequent, persistent, and intentional, rendering My Credit Guy liable for punitive damages pursuant to 15 U.S.C. § 1679g.

100.    Harris and other class members are entitled to recover costs and attorney's fees from My Credit Guy's pursuant to 15 U.S.C. § 1679g.

## COUNT II
## MINNESOTA CREDIT SERVICES ORGANIZATIONS ACT
### Minn. Stat. § 332.52, *et. seq.*

101.    Harris incorporates by reference all preceding paragraphs as though fully stated herein.

102.    Defendant My Credit Guy's foregoing actions and omissions violated numerous and multiple provisions of the MN CSOA, including without limitation Minn. Stat. §§ 332.53, 332.56, 332.58, and 332.59.

103.    Specifically, My Credit Guy charged Harris and other class members money for credit services before such services were performed in violation of Minn. Stat. § 332.56(1).

104.    Indeed, My Credit Guy's contract is facially violative of the MN CSOA, as purporting to only provide "initial services," and not fully performed services as required by the MN CSOA.

105.    My Credit Guy also made unauthorized charges to Harris and other class members' bank accounts, even after Harris notified My Credit Guy that he never authorized these charges, in violation of Minn. Stat. § 332.58(2).

106.   My Credit Guy's Contracts with Harris and other class members did not include the total amount of all payments to be made in violation of Minn. Stat. § 332.58(2).

107.   My Credit Guy's failure to notify Harris and other class members in the Contract of the total price required for its services and its attempt to make unauthorize charges to their bank accounts were untrue or misleading representations and constituted the commission of fraud and deception upon Harris and other class members in connection with the offer or sale of the services of the credit repair organization in violation of Minn. Stat. § 332.56(4).

108.   My Credit Guy attempted to have Harris and other class members waive certain rights under MN CSOA including, but not limited to, rights to assert certain legal claims and seek certain types and amounts of damages under MN CSOA in violation of Minn. Stat. §§ 332.53, 332.59.

109.   The Contract did not include the percentage of My Credit Guy's customers for whom the My Credit Guy has fully and completely performed the services that My Credit Guy agreed to perform for Harris and other class members in violation of Minn. Stat. § 332.58(5).

110.   As a result of My Credit Guy's violations of Minn. Stat. §§ 332.53, 332.56, 332.58, and 332.59, Harris and other class members have suffered actual damages, including without limitation out-of-pocket expenses, informational injury, and emotional distress.

111.    Specifically, Harris was injured by having to pay $19.99 to obtain his credit report and pay My Credit Guy $325.00 before My Credit Guy would perform the services and before those amounts were due under the Contract and under the law. Other class members made similar payments.

112.    The prepayment of these out-of-pocket expenses damaged Harris and other class members because they lost the time value of their money—they were deprived of the use of those funds, so the funds were no longer available for their own use to pay their creditors to improve their credit report, or for their general living expenses.

113.    One reason Minn. Stat. § 332.56(1) prohibits credit repair organizations from charging for credit services before such services are performed is to ensure that consumers can still pay their creditors while the services are being performed.

114.    Harris and other class members were also injured because My Credit Guy did not fully perform the services for which Harris and other class members paid My Credit Guy.

115.    Harris was also injured because he did not receive the benefits of the provisions of MN CSOA that My Credit Guy violated.

116.    Moreover, My Credit Guys' repeated attempts to make unauthorized charges to Harris' debit card and checking account caused him emotional distress, including stress, worry, and anxiety. Harris was so concerned that he moved his money out of the checking account so My Credit Guy could not access it. Likewise, Harris was

afraid to put money into his own checking account because My Credit Guy continued making unauthorized charges to his account.

117.    My Credit Guys' failure to provide complete and accurate information in its contracts and disclosures also caused Harris and other class members informational injuries, because they would have chosen other courses of action and spent their money in other ways if full and accurate information was provided to them.

118.    Harris and other class members are therefore entitled to recover actual damages pursuant to Minn. Stat. § 332.60.

119.    My Credit Guy's noncompliance was frequent, persistent, and intentional, rendering My Credit Guy liable for punitive damages pursuant to Minn. Stat. § 332.60.

120.    Harris and other class members are entitled to recover costs and attorney's fees from My Credit Guy pursuant to Minn. Stat. § 332.60.

**COUNT III**
**MINNESOTA DECEPTIVE TRADE PRACTICES ACT**
**Minn. Stat. § 325D.43, *et. seq*.**

121.    Harris incorporates by reference all preceding paragraphs as though fully stated herein.

122.    My Credit Guy intentionally violated the Minnesota Uniform Deceptive Trade Practices Act, Minn. Stat. § 325D.43, *et. seq.*

123.    My Credit Guy engaged in unfair or unconscionable acts or practices in violation of Minn. Stat. § 325D.44, Subd. 1(13).

124.   My Credit Guy engaged in conduct which created a likelihood of confusion or misunderstanding in violation of Minn. Stat. § 325D.44, Subd. 1(14).

125.   My Credit Guy's unfair or unconscionable conduct that created a likelihood of confusion or misunderstanding includes, but is not limited to, My Credit Guy making unauthorized charges to Harris and other class members' bank accounts that were not disclosed or agreed to in any written agreement, even after Harris notified My Credit Guy that he had not authorized all the charges.

126.   As a result of My Credit Guy's violations of Minn. Stat. § 325D.44, Harris and other class members have suffered actual damages, including without limitation out-of-pocket expenses, informational injury, emotional distress, costs and disbursements, costs of an investigation, and reasonable attorney fees.

127.   Specifically, Harris was injured by having to pay $19.99 to obtain his credit report and pay My Credit Guy $325.00 before My Credit Guy would perform the services and before those amounts were due under the Contract and under the law. Other class members made similar payments.

128.   The prepayment of these out-of-pocket expenses damaged Harris and other class members because they lost the time value of their money—they were deprived of the use of those funds, so the funds were no longer available for their own use to pay their creditors to improve their credit report, or for their general living expenses.

129.    Harris and other class members were also injured because My Credit Guy did not fully perform the services for which Harris and other class members paid My Credit Guy.

130.    Moreover, My Credit Guys' repeated attempts to make unauthorized charges to Harris' debit card and checking account caused him emotional distress, including stress, worry, and anxiety. Harris was so concerned that he moved his money out of the checking account so My Credit Guy could not access it. Likewise, Harris was afraid to put money into his own checking account because My Credit Guy continued making unauthorized charges to his account.

131.    My Credit Guys' failure to provide complete and accurate information in its contracts and disclosures also caused Harris and other class members informational injuries, because they would have chosen other courses of action and spent their money in other ways if full and accurate information was provided to them.

132.    Under the Minnesota Uniform Deceptive Trade Practices Act, "[t]he court may award attorneys' fees to the prevailing party if . . . the party charged with a deceptive trade practice has willfully engaged in the trade practice knowing it to be deceptive." Minn. Stat. § 325D.45, subd. 2.

133.    My Credit Guy have engaged in all of the above conduct willfully and knowing that it was deceptive.

134.    Additionally, a consumer injured by a violation of Minn. Stat. § 325D.43, *et. seq.* may also bring an action under Minn. Stat. § 8.31 for "damages, together with

costs and disbursements, including costs of investigation and reasonable attorney's fees, and receive other equitable relief as determined by the court." A private right of action by a consumer under this chapter is in the public interest.

135.   As a result of My Credit Guy's violations, Harris and other class members are entitled to injunctive and declaratory relief, as well as recovery of their damages, costs, and reasonable attorney fees.

**COUNT IV**
**MINNESOTA CONSUMER FRAUD ACT**
**Minn. Stat. § 325F.68, *et. seq*.**

136.   Harris incorporates by reference all preceding paragraphs as though fully stated herein.

137.   Minnesota's Consumer Fraud Act (CFA) prohibits "[t]he act, use, or employment by any person of any fraud, unfair or unconscionable practice, false pretense . . . misrepresentation, misleading statement or deceptive practice, with the intent that others rely thereon in connection with the sale of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby" in violation of Minnesota's Consumer Fraud Act (CFA), Minn. Stat. § 325F.68, Minn. Stat. § 325F.69 (2023).

138.   The CFA defines "merchandise" to include "any objects, wares, goods, commodities, intangibles, real estate, loans, or services," which include the credit services My Credit Guy was offering and selling. Minn. Stat. § 325F.68, Subd. 2.

139.   Under the CFA, "an unfair method of competition or an unfair or unconscionable act or practice is any method of competition, act, or practice that:

26

(1) offends public policy as established by the statutes, rules, or common law of Minnesota; (2) is unethical, oppressive, or unscrupulous; or (3) is substantially injurious to consumers." Minn. Stat. § 325F.69, subd. 8 (2023).

140.   By making unauthorized charges to Harris and other class members' bank accounts that were not disclosed or agreed to in any written agreement, even after Harris notified My Credit Guy that he had not authorized all its charges, My Credit Guy's conduct constituted an unfair, unconscionable, and deceptive practice in connection with the sale of any merchandise that was unethical, oppressive, unscrupulous, and substantially injurious to consumers in violation of the CFA.

141.   Minn. Stat. § 325F.70, subd. 3 (2023) provides the following: "In addition to the remedies otherwise provided by law, a consumer injured by a violation of sections 325F.68 to 325F.70 . . . may bring a civil action and recover damages, together with costs and disbursements, including costs of investigation and reasonable attorney fees, and receive other equitable relief as determined by the court."

142.   Additionally, a consumer injured by a violation of Minn. Stat. §§ 325F.68 - 325F.70 may also bring an action under Minn. Stat. § 8.31.  A private right of action by a consumer under this chapter is in the public interest.

143.   As a result of My Credit Guy' violations, Harris and other class members have suffered actual damages, including without limitation out-of-pocket expenses, informational injury, emotional distress, costs and disbursements, costs of an investigation, and reasonable attorney fees.

144.    Specifically, Harris was injured by having to pay $19.99 to obtain his credit report and pay My Credit Guy $325.00 before My Credit Guy would perform the services and before those amounts were due under the Contract and under the law. Other class members made similar payments.

145.    The prepayment of these out-of-pocket expenses damaged Harris and other class members because they lost the time value of their money—they were deprived of the use of those funds, so the funds were no longer available for their own use to pay their creditors to improve their credit report, or for their general living expenses.

146.    Harris and other class members were also injured because My Credit Guy did not fully perform the services for which Harris and other class members paid My Credit Guy.

147.    Moreover, My Credit Guys' repeated attempts to make unauthorized charges to Harris' debit card and checking account caused him emotional distress, including stress, worry, and anxiety. Harris was so concerned that he moved his money out of the checking account so My Credit Guy could not access it. Likewise, Harris was afraid to put money into his own checking account because My Credit Guy continued making unauthorized charges to his account.

148.    My Credit Guys' failure to provide complete and accurate information in its contracts and disclosures also caused Harris and other class members informational injuries, because they would have chosen other courses of action and

spent their money in other ways if full and accurate information was provided to them.

149.    Harris and other class members are therefore entitled to these damages from My Credit Guy, hereby demand the same.

## COUNT V
## FRAUD/INTENTIONAL MISREPRESENTATION

150.    Harris incorporates by reference all preceding paragraphs as though fully stated herein.

151.    Under Minnesota law, to state a claim of fraud there must have been: (1) a false representation of a past or present material fact susceptible of knowledge; (2) knowledge by the person making the false representation that it is false or ignorance of the truth of the assertion; (3) an intention to induce the claimant to act or to justify the claimant to act; (4) the claimant must have been induced to act or justified in acting in reliance on the representation; and (5) the claimant must suffer damage proximately caused by the misrepresentation.

152.    My Credit Guy made false representations of material facts, including but not limited to the representations that its credit services would cost a one-time fixed price, and that it would not charge Harris and other class members or receive payment before the completion of the credit services.

153.    These representations were false, misleading, and misrepresentations.

154.    My Credit Guy made such representations to Harris and other class members knowing them to be false or with reckless disregard for the truth.

155.   My Credit Guy's representations were material.

156.   My Credit Guy intended the representations to induce Harris and other class members to enter Contracts.

157.   My Credit Guy's representations did induce Harris and other class members to enter Contracts and pay My Credit Guy a fixed price amount for credit services based on the representation that this was the only fee for the services.

158.   My Credit Guy's actions constitute common-law fraud and intentional misrepresentation.

159.   As a direct result of My Credit Guy's fraud and misrepresentations, Harris and other class members have suffered actual damages, including without limitation out-of-pocket expenses, informational injury, and emotional distress in an amount to be proven at trial.

160.   Specifically, Harris was injured by having to pay $19.99 to obtain his credit report and pay My Credit Guy $325.00 before My Credit Guy would perform the services and before those amounts were due under the Contract and under the law. Other class members made similar payments.

161.   The prepayment of these out-of-pocket expenses damaged Harris and other class members because they lost the time value of their money—they were deprived of the use of those funds, so the funds were no longer available for their own use to pay their creditors to improve their credit report, or for their general living expenses.

162.    Harris and other class members were also injured because My Credit Guy did not fully perform the services for which Harris and other class members paid My Credit Guy.

163.    Moreover, My Credit Guys' repeated attempts to make unauthorized charges to Harris' debit card and checking account caused him emotional distress, including stress, worry, and anxiety. Harris was so concerned that he moved his money out of the checking account so My Credit Guy could not access it. Likewise, Harris was afraid to put money into his own checking account because My Credit Guy continued making unauthorized charges to his account.

164.    My Credit Guys' failure to provide complete and accurate information in its contracts and disclosures also caused Harris and other class members informational injuries, because they would have chosen other courses of action and spent their money in other ways if full and accurate information was provided to them.

165.    Harris and other class members are therefore entitled to these damages from My Credit Guy, hereby demand the same.

## COUNT VI
## NEGLIGENT MISREPRESENTATION

166.    Harris incorporates by reference all preceding paragraphs as though fully stated herein.

167.    A person who: (1) through his or her profession, business, or employment, or in any transaction in which he or she has a pecuniary interest; (2) fails to exercise

reasonable care or competence in obtaining or communicating information; and (3) thereby supplies false information while guiding others in their transactions; is (4) liable for any pecuniary loss caused by claimant's justifiable reliance.

168.   My Credit Guy was operating as a business and had pecuniary interest in Harris paying My Credit Guy for its services.

169.   As described above, My Credit Guy failed to exercise reasonable care or competence in communicating the following representations to Harris: that its credit services would cost a one-time fixed price, and that it would not charge Harris and other class members or receive payment before the completion of the credit services.

170.   These representations discussed above were false, misleading, and misrepresentations.

171.   Harris justifiably relied on this false information when he entered the Contract and made the payment to My Credit Guy.

172.   As a direct result of My Credit Guy's negligent misrepresentations discussed above, Harris and other class members have suffered actual damages, including without limitation out-of-pocket expenses, informational injury, and emotional distress in an amount to be proven at trial.

173.   Specifically, Harris was injured by having to pay $19.99 to obtain his credit report and pay My Credit Guy $325.00 before My Credit Guy would perform the services and before those amounts were due under the Contract and under the law. Other class members made similar payments.

174.    These out-of-pocket expenses damaged Harris and other class members because they lost the time value of their money—they were deprived of the use of those funds, so the funds were no longer available for their own use to pay their creditors to improve their credit report, or for their general living expenses.

175.    Harris and other class members were also injured because My Credit Guy did not fully perform the services for which Harris and other class members paid My Credit Guy.

176.    Moreover, My Credit Guys' repeated attempts to make unauthorized charges to Harris' debit card and checking account caused him emotional distress, including stress, worry, and anxiety. Harris was so concerned that he moved his money out of the checking account so My Credit Guy could not access it. Likewise, Harris was afraid to put money into his own checking account because My Credit Guy continued making unauthorized charges to his account.

177.    My Credit Guys' failure to provide complete and accurate information in its contracts and disclosures also caused Harris and other class members informational injuries, because they would have chosen other courses of action and spent their money in other ways if full and accurate information was provided to them.

178.    Harris and other class members are therefore entitled to these damages from My Credit Guy, hereby demand the same.

## COUNT VII
## BREACH OF CONTRACT

179.    Harris incorporates by reference all preceding paragraphs as though fully stated herein.

180.    My Credit Guy entered Contracts with Harris and other class members.

181.    Those Contracts provided for a one-time fixed price for My Credit Guy to perform credit services.

182.    Those Contracts stated, "The Company shall not charge the Customer or receive payment before the completion of the Initial Services and payment by the Customer is due on the 30th day after the Company after completion of the Initial Services."

183.    My Credit Guy breached this Contract provision when My Credit Guy charged and received payments from Harris and other class members before My Credit Guy fully performed the services.

184.    My Credit Guy also breached those Contracts by attempting to charge Harris and other class members additional recurring fees that were not agreed to in the Contract in order to continue performing the credit services.

185.    My Credit Guy also breached those Contracts by failing to fully perform its obligations under those Contracts when Harris and other class members refused to pay the additional fees.

186.    As a result of My Credit Guy's breaches, and as outlined above, Harris and other class members have suffered actual damages, including without limitation out-of-pocket expenses and emotional distress.

187.    Specifically, Harris was injured by having to pay $19.99 to obtain his credit report and pay My Credit Guy $325.00 before My Credit Guy would perform the services and before those amounts were due under the Contract and under the law. Other class members made similar payments.

188.    The prepayment of these out-of-pocket expenses damaged Harris and other class members because they lost the time value of their money—they were deprived of the use of those funds, so the funds were no longer available for their own use to pay their creditors to improve their credit report, or for their general living expenses.

189.    Harris and other class members were also injured because My Credit Guy did not fully perform the services for which Harris and other class members paid My Credit Guy.

190.    Moreover, My Credit Guys' repeated attempts to make unauthorized charges to Harris' debit card and checking account caused him emotional distress, including stress, worry, and anxiety. Harris was so concerned that he moved his money out of the checking account so My Credit Guy could not access it. Likewise, Harris was afraid to put money into his own checking account because My Credit Guy continued making unauthorized charges to his account.

191.    Harris and other class members are therefore entitled to these damages from My Credit Guy, hereby demand the same.

## COUNT VIII
## UNJUST ENRICHMENT

192.    Harris incorporates by reference all preceding paragraphs as though fully stated herein.

193.    My Credit Guy charged and received payments from Harris and other class members before My Credit Guy fully performed the services.

194.    My Credit Guy attempted or did charge Harris and other class members additional recurring fees in order to continue performing the credit services.

195.    My Credit Guy failed to fully perform its obligations when Harris and other class members refused to pay the additional fees.

196.    My Credit Guy was enriched because it received funds from Harris and other class members in amounts that far exceeds the value of the services My Credit Guy provided.

197.    Harris and other class members were impoverished because such money is no longer available for their own use to pay their creditors to improve their credit report, or for their general living expenses.

198.    It would be unjust for My Credit Guy to keep the full amount of the funds it received from Harris and other class members.

199.   Based upon the doctrine of unjust enrichment, My Credit Guy is liable to Harris and other class members for past, present, and prospective damages in an amount to be proven at trial.

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiff Curtis Harris asks this Court to enter Judgment against Defendant My Credit Guy L.L.C. as follows:

a.)   Certification of this action as a class action on behalf of the putative classes;

b.)   Designation of Plaintiff as Class Representative;

c.)   Appointment of the Christensen Sampsel PLLC  and Consumer Justice Center P.A. as class counsel;

d.)   Judgment in favor of Plaintiff on all counts;

e.)   Declaration that My Credit Guy's practices complained of herein are unlawful;

f.)   An injunction requiring My Credit Guy to cease and desist from engaging in these unlawful practices;

g.)   An award of actual damages, including without limitation out-of-pocket expenses, informational injury, and emotional distress;

h.)   An award of pre-judgment and post-judgment interest as provided by law;

i.)   An award of punitive damages against My Credit Guy, pursuant to 15 U.S.C. § 1679g(a)(2) and Minn. Stat. § 332.60;

j.)   An award of reasonable attorney fees and costs, pursuant to 15 U.S.C. 15 U.S.C. § 1679g(a)(3), Minn. Stat. § 332.60, Minn. Stat. § 325D.45, subd. 2, and Minn. Stat. § 325F.70, subd. 3 (2023);

k.)     In the alternative and for My Credit Guy's unjust enrichment, an equitable award in favor of Harris and other class members for the amount My Credit Guy has been unjustly enriched as a result of its actions and inactions; and

l.)     Such other and further relief as may be just and proper.

Respectfully,

                                **CHRISTENSEN SAMPSEL PLLC**

Dated: April 19, 2024            /s/ Carl E. Christensen
                                Carl E. Christensen (MN #350412)
                                Christopher Wilcox (MN #392536)
                                Ryan P. Supple (MN #395838)
                                305 North Fifth Avenue, Suite 375
                                Minneapolis, MN 55401
                                Ph: (612) 473-1200
                                carl@christensensampsel.com
                                chris@christensensampsel.com
                                ryan@christensensampsel.com

                                **CONSUMER JUSTICE CENTER P.A.**

                                Thomas J Lyons Jr. (#249646)
                                367 Commerce Court
                                Vadnais Heights, MN  55127
                                Ph: (651) 770-9707
                                tommy@consumerjusticecenter.com

                                *Attorneys for Plaintiff and Potential Class*